IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALEICHA BOLTON, | ) | CASE NO. 1:11-cv-2301 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Aleicha Bolton ("Plaintiff" or "Bolton") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, it is recommended that the Commissioner's decision be **AFFIRMED**.

## I.  Procedural History

Bolton filed her application for Disability Insurance Benefits and Supplemental Social Security Income on November 26, 2008.[1]  Tr. 9, 47-50, 136-142. The application alleged a disability onset date of October 13, 2008.  Tr. 9, 136-142.  Bolton alleged disability based on mental problems (psychosis and major depressive disorder), a blood disorder, and constant pain

---

[1] The ALJ indicates that Plaintiff filed her applications on November 26, 2008.  Tr. 9.  The Commissioner agrees with this filing date and a filing date of November 26, 2008 is supported by the record. Tr. 47-50 and Doc. 15 (reflecting a filing date of November 26, 2008).  While the exact date of filing is not determinative of issues before this Court, the undersigned notes that, the filing date alleged by Plaintiff, December 4, 2008, is also supported by the record.  Tr. 136-142 and Doc. 14) (reflecting a filing date of December 4, 2008).

1

from fibromyalgia. Tr. 30, 47-50, 52, 55, 62, 66, 70, 73, 77, 81. After her applications were denied initially and upon reconsideration (Tr. 47-57, 62-83), Bolton requested a hearing (Tr. 84-86), and an administrative hearing was held before Administrative Law Judge Julia A. Terry ("ALJ") on March 29, 2011. Tr. 27-46.

In her April 14, 2011, decision (Tr.6-26) the ALJ determined that Bolton had not been under a disability from October 13, 2008, through the date of the ALJ's decision. Tr. 21. Bolton requested review of the ALJ's decision by the Appeals Council. Tr. 5. On August 31, 2011, the Appeals Council denied Bolton's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Bolton was born on March 26, 1969, and was 42 years old at the time of the hearing. Tr. 136, 140. She is a high school graduate with one year of college. Tr. 42, 200. She was unmarried with no children. Tr. 285. Bolton's past work experience includes work as an inventory clerk, manager, sales clerk, receptionist, administrative assistant, and order clerk. Tr. 41, 195, 202-205.

### B. Medical Evidence[2]

#### 1. Medical Treatment

On October 17, 2008, Bolton was admitted to Northcoast Behavioral Healthcare for psychiatric review after appearing at the police station with complaints of hearing voices. Tr. 284. Bolton reported that she had been hearing the voices for two days and that the voices were

---

[2] Bolton's appeal is not based on the ALJ's findings or evaluation of her physical impairments. Thus, only relevant psychological medical evidence is summarized herein.

threatening her and her family. Tr. 284. She also indicated that she believed her boss was threatening her because he wanted to live with her but she refused. Tr. 284. She had not slept for several days prior to appearing at the police station and reported having been under a lot of stress from her work. Tr. 285. Upon admission, she denied thoughts of hurting herself or others; she was diagnosed with psychosis, not otherwise specified, paranoid schizophrenia, major depressive disorder with psychotic features and a Global Assessment of Functioning ("GAF") of 20.[3] Tr. 284. Within 24 to 48 hours of her admission, Bolton began to show signs of improvement and her symptoms started to abate. Tr. 285. While she continued to complain of depression, "her psychosis abated rapidly and completely." Tr. 285. Bolton was "calm and cooperative throughout her stay in the hospital and at no time during the hospitalization did she exhibit suicidal or aggressive gestures." Tr. 285. Following psychological test, the unit psychologist opined that Bolton suffered with depressive disorder. Tr. 285. Four days after admission, Bolton indicated she wanted to go home but agreed to stay for a few more days so that the effects of her medication could be assessed. Tr. 285. At discharge, on October 24, 2008, Bolton did not exhibit any signs of psychosis. Tr. 286. Bolton was discharged with a prescription for Cymbalta for her depression and she was not showing any side effects from the medication. Tr. 286. Bolton's diagnosis upon discharge was major depressive disorder, mild; brief psychotic disorder, now resolved; alcohol abuse and a GAF of 55.[4] Tr. 286.

Following the October 2008 hospitalization, from about November 2008 through January

---

[3] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF between 11 and 20 indicates "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimum hygiene (e.g., smears feces) or gross impairment in communication (e.g. largely incoherent or mute)." *Id.*

[4] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

2001, Bolton sought and received treatment at the Center for Families and Children. Tr. 382-398, 545-566. On November 7, 2008, and November 19, 2008, counselors diagnosed Bolton with major depressive disorder, with psychotic features, and bipolar disorder; assessed a GAF of 45;[5] and recommended outpatient treatment. Tr. 382-384, 397-398, 558. On January 7, 2009, treatment notes reflect that, while Bolton's mood was depressed, she had done "okay" with the holidays, she was alert, coherent, clean and neat, her thought processes were concrete and intact, she was goal directed, and her insight and judgment were fair. Tr. 395-396. Bolton denied any side effects from her medication. Tr. 396. On February 4, 2009, Bolton was depressed but she was again alert and coherent and reported no psychotic symptoms. Tr. 394-395. On February 19, 2009, Bolton appeared for treatment in a depressed mood. Tr. 391. The examiner noted that Bolton was alert and coherent, she was distractible but directable, her thought process was concrete and intact, and that there were no obvious hallucinations noted or reported during the visit. Tr. 391. Bolton's next visit was scheduled for April 1, 2009. Tr. 392.

Bolton missed her appointment on April 1, 2009 (Tr. 390), but appeared for an appointment on April 8, 2009. Tr. 388. During her April 8, 2009, appointment, her treatment provider indicated that Bolton's thought process was concrete but with flight of ideas. Tr. 388. Bolton was depressed. Tr. 388. Bolton's insight was constricted and her judgment was poor to fair. Tr. 388. A follow up visit was scheduled for two months later on June 8, 2009. Tr. 388. Notwithstanding a change in symptoms, there was no change in diagnosis. Tr. 388. Bolton did not show for her June 8, 2009, appointment, and she did not show for an appointment on June 17, 2009. Tr. 386, 387. Bolton did show for a June 18, 2009, appointment and, during that appointment, her thought process was concrete but she exhibited some paranoia and complained

---

[5] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

4

of hallucinations; she was irritable and slightly agitated. Tr. 385. There was no change in Bolton's prior diagnosis. Tr. 385.

Bolton again sought treatment from the Center for Families and Children in 2010 through January 2011 during which time she was generally alert and coherent at her appointments. Tr. 547-556, 562-566. On January 13, 2010, Bolton was slightly anxious and depressed but her thought content and perception were normal (no indication of paranoia or hallucinations). Tr. 556. On April 27, 2010, Bolton stated that she was feeling "pretty good." Tr. 554. She had no hallucinations but was paranoid when in crowds of people. Tr. 554. On June 8, 2010, Bolton reported feeling "much better." Tr. 552. Her paranoia had been decreasing recently and she did not have hallucinations. Tr. 552. On July 21, 2010, she indicated that, since being on Lyrica, she was seeing figures coming towards her. Tr. 551. She was mainly paranoid only at night. Tr. 551. On August 11, 2010, Bolton was seen for medication management and the nurse indicated that Bolton's depression was "not as deep." Tr. 566. She was "calm" and "not seeing things." Tr. 566. The nurse did note that Bolton was potentially a risk to herself because she had thoughts of hurting herself, but the nurse also noted that Bolton indicated she would never follow through on those thoughts. Tr. 566. On September 29, 2010, Bolton was not experiencing hallucinations but she did have some paranoia. Tr. 550. She was anxious and depressed due to her physical status (pains and obesity). Tr. 550. She was making *some progress* "towards her pharmacological management ISP goals and objectives." Tr. 550. On October 19, 2010, appointment, Bolton reported no hallucinations when alone; she reported experiencing hallucinations only in crowds of people. Tr. 549. Her treatment provider indicated that Bolton was continuing to improve and she was making *significant progress* "towards her pharmacological management ISP goals and objectives." Tr. 549. During a November 10, 2010,

5

medication management appointment, Bolton reported that the "voices (whispers) are gone," but also reported that she still feels that someone is following her but also indicated that she knew it was not real. Tr. 565. Bolton also reported being fearful of the dark. Tr. 565. At her January 10, 2011, appointment, Bolton was paranoid ("afraid of the dark") and felt that someone was following her but her treatment provider assessed her as stable because she was medication compliant. Tr. 547. Further, it was noted that Bolton was making *significant progress* "towards her pharmacological management ISP goals and objectives." Tr. 547.

### 2. Medical Opinions

#### a. Center for Families and Children

On August 24, 2009, medical providers at the Center for Families and Children completed a Mental Status Questionnaire ("Questionnaire"). Tr. 456-460. The two pages of the Questionnaire that contain the handwritten answers to questions concerning Bolton's mental condition are signed at the bottom by a nurse. Tr. 458-459. The last page of the Questionnaire contains a statement that, if a consultative examination is needed, Dr. Bukuts, M.D. is willing to complete such an examination. Tr. 460. Additionally, Dr. Bukuts' signature is affixed to the last page of the Questionnaire.[6] Tr. 460. Under the "mental status" section, the nurse indicated that Bolton was depressed, irritable and anxious, and is paranoid. Tr. 458. However, she noted that Bolton's hallucinations were decreased and mostly occurred at night. Tr. 458. The nurse indicated that Bolton's insight and judgment were fair to good and her concentration was distractible but directable. Tr. 458. The nurse stated that Bolton's prognosis is good with medication. Tr. 459. She stated that Bolton could comprehend and follow simple and brief instructions but may not be able to complete tasks in a timely manner because she is distracted

---

[6] The Questionnaire contains the following note: "The program requires that a psychologist or physician must have reviewed and signed the Mental Status Evaluation." Tr. 460.

easily. Tr. 459. The nurse noted that once during a visit Bolton was attentive for only 11 minutes but Bolton can sometimes maintain attention for more than 30 minutes. Tr. 459. Because of her panic and symptoms of paranoia, the nurse stated that Bolton had isolated herself in her apartment; leaving only for medical appointments. Tr. 459. The nurse also indicated that too much stress and pressure may cause Bolton's symptoms of psychosis, depression and anxiety to worsen. Tr. 459.

        **b.**        **Consultative Examining Physician – Dr. Herschel Pickholtz, Ed. D., Psychologist**

On February 24, 2009, Dr. Herschel Pickholtz performed a one-time psychological examination of Bolton. Tr. 312-318. He indicated that Bolton's affect appeared to be a little constricted and she appeared to be depressed. Tr. 314. His report indicates that Bolton reported experiencing delusionary ideation twice per week for about 2 minutes for each episode and hallucinatory perceptions twice per week for 20 minutes each episode. Tr. 315. Dr. Pickholtz indicated that with psychiatric medication the degree of psychotic processing would decrease greatly. Tr. 315. Further, he indicated that Bolton described the impact of the psychotic process upon her daily routine as moderately disruptive. Tr. 315. Bolton indicated that she does not experience symptoms of anxiety. Tr. 315. Dr. Pickholtz's diagnoses included major depressive disorder, recurrent and severe, with psychotic features; alcohol abuse in full sustained remission; severe psychological stressors; occupational problems and economic problems; other psychological stressors related to psychiatric symptoms; and a GAF of approximately 45. Tr. 317-318. He described Bolton's four work-related mental capabilities as follows:

1. Overall abilities to understand and follow instructions based upon overall responding, presentation and description of daily activities I think places her within the mild range of impairment.

2. Overall abilities to maintain attention and to perform simple repetitive tasks based upon pace and persistence during the evaluation fell within the moderate range of impairment.

3. Overall abilities to relating to others including fellow workers and supervisors seem to fall within the markedly impaired range.

4. Overall abilities to withstand the stresses and pressure associated with day-to-day work activities, from a psychological perspective, fell within the markedly impaired range.

Tr. 317.

### c.      State Agency Reviewing Physician – Dr. Suzanne Castro, Psy.D.

On March 6, 2009, Dr. Suzanne Castro completed a Mental Residual Capacity Assessment (Mental "RFC").[7]  Tr. 333-335.  She assessed no marked limitations and moderate limitations in 8 out of the 20 rated categories.  Tr. 333-334.  Moderate limitations were found in Bolton's ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  Tr. 333-334.

Dr. Castro found Bolton's allegations to be only partially credible because no anxiety was noted in the psychological examination and, while previously hospitalized as a result of psychosis, Bolton did not appear currently to be psychotic and any symptoms seemed to improve with medication.  Tr. 335.  Dr. Castro gave only partial weight to Dr. Pickholtz's opinions in light of the evidence in the file.  Tr. 335.  She opined that moderate impairments in social

---

[7] On September 1, 2009, Dr. Robyn Hoffman, Ph.D., affirmed the March 6, 2009, assessment. Tr. 461.

8

interaction and tolerance of stress were more appropriate due to Bolton appropriately relating to the consulting examiner, adequately relating during the application process and having had no problems getting along on the job or with authority figures.  Tr. 335.  Although Bolton appeared to have problems with tolerating stress, Dr. Castro opined that the medical evidence in the file along with Bolton's activities of daily living demonstrate Bolton's ability to cope with a basic daily routine.  Tr. 335.

    C. **Testimonial Evidence**

        1.       **Bolton's Testimony**

Bolton was represented by counsel and testified at the administrative hearing.  Tr. 32-41.  Around October 2008, Bolton began hearing and believing that people were following her.  Tr. 36.  She ultimately went to the police station to make a complaint because she believed that her boss and his friends were following her.  Tr. 36.  Following that report, she was taken to the hospital for treatment.  Tr. 36.

She testified that she was living at a senior and disability facility because of her mental health issues.  Tr. 33-34.  She indicated that community service volunteers assist her with laundry and chores, her sister assists with grocery shopping, and various groups provide her with transportation.  Tr. 33-34.  She does not drive because she is afraid that she will get in an accident.  Tr. 34.  She explained that her daily activities consisted of preparing microwavable meals and performing physical therapy exercises to help alleviate her pain.  Tr. 32, 34.  She testified that, other than her mother and sister, she really does not socialize because she becomes very anxious around other people.  Tr. 35.  During her testimony, she repeated that, when she is out, she feels like someone is following her.  Tr. 34-36.

Bolton testified that she takes Lyrica for her pain and that helps somewhat but not entirely. Tr. 37. She indicated that she also takes medication for her mental health issues. Tr. 37. However, notwithstanding increases in the medication dosages, she indicated that she continues to hear voices, usually in the dark when she is trying to sleep. Tr. 37-38. She stated that she lacks the ability to concentrate for extended periods of time. Tr. 38. As a side effect of her medications, she indicated that she gained a lot of weight, which has been very upsetting to her. Tr. 38.

When she was asked whether she felt her psychosis had gotten better or worse since October 2008, Bolton indicated it goes back and forth but she always seems to hear voices and have panic attacks. Tr. 38. She also testified regarding her level of pain. Tr. 39.

Bolton testified that prior to October 2008, her alleged disability onset date, she worked and enjoyed being around others and the work that she did. Tr. 36. She described her past work as fulfilling and indicated she was excited about her career. Tr. 36. The longest job that she held was at the NAACP. Tr. 36. She left that position to take a job at Bank of America in North Carolina. Tr. 37. At that time, her father died from cancer, and her mother had been diagnosed with cancer. Tr. 36-37. She indicated that she began drinking to deal with the depression and that led to a lot of problems. Tr. 37. She testified that she had not had alcohol since October of 2008 because she could not drink with the medication that she was required to take. Tr. 37.

### 2. Vocational Expert's Testimony

Vocational Expert Ms. Rice ("VE") testified at the hearing. Tr. 41-45. The VE provided testimony regarding the skill and exertional level of Bolton's past work. Tr. 41. The ALJ asked the VE whether the following hypothetical individual would be able to perform

Bolton's past relevant work: an individual who can perform light work, lifting and carrying 20 pounds occasionally and 10 pounds frequently, stand for 6 out of 8 hours and sit for 6 out of 8 hours; perform all posturals at least occasionally except for no climbing of ladders, ropes or scaffolds; should avoid concentrated exposure to work hazards; mentally is limited to 1 and 2-step repetitive tasks; should not perform work that requires strict production quotas; should have only superficial interaction with coworkers and supervisors; should work in a relatively stable work setting with few changes. Tr. 42. The VE indicated that such an individual would not be able to perform Bolton's past relevant work. Tr. 42.

The ALJ modified the 1 and 2-step repetitive task limitation to jobs that would only allow for simple, repetitive tasks. Tr. 42. With that modification, the VE testified that, while such an individual would be unable to perform Bolton's past relevant work, there would be other jobs available. Tr. 42-43. The VE indicated that housekeeping cleaner, mailroom clerk, and office helper were classified as light, unskilled jobs and would be available to the described hypothetical individual. Tr. 43.

The ALJ then modified the hypothetical from light work to sedentary work with lifting and carrying no more than 10 pounds occasionally and standing and walking only a total of 2 hours in an 8 hour day and having to sit for at least 6 hours in an 8 hour day. Tr. 43. The VE testified that, with that modification, the following jobs would be available: food and beverage order clerk, telephone quotation clerk, and charge account clerk. Tr. 43-44.

The ALJ asked the VE to consider Bolton's own testimony that had been provided at the hearing and whether, based on that testimony, such an individual could perform any job in significant numbers in the national economy. Tr. 44-45. The VE testified that, based on the

11

description of her isolation from others, such an individual would be precluded from competitive employment.  Tr. 45.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her April 14, 2011 decision, the ALJ made the following findings:

1.  Bolton met the insured status requirements through December 31, 2013. Tr. 11.

2.  Bolton had not engaged in substantial gainful activity since October 13, 2008, the alleged onset date.  Tr. 11.

3.  Bolton had the following severe impairments: obesity, fibromyalgia and myalgia, a major depressive disorder with psychotic features, and alcohol abuse in remission.  Tr. 11.  Bolton's anemia was not a severe impairment.  Tr. 11-12.

4.  Bolton did not have an impairment or combination of impairments that met or medically equal one of the listed impairments.[8]  Tr. 11-13.

5.  Bolton had the residual functional capacity ("RFC") to perform light work except she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can stand and/or walk 6 hours in an 8 hour workday; she can sit 6 hours in an 8 hour workday; she can occasionally balance, crouch, crawl, kneel, stoop and climb ramps and stairs, but should not climb ladders, ropes or scaffolds; she should avoid

---

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

      concentrated exposure to work hazards; she is limited to jobs that require only simple repetitive tasks and should not perform work that requires strict production quotas; she can only have superficial interaction with supervisors and coworkers; and her work setting should be relatively static with few changes. Tr. 13-19.

6. Bolton was unable to perform any past relevant work. Tr. 19.

7. Bolton was born on March 26, 1969, and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 20.

8. Bolton had at least a high school education and was able to communicate in English. Tr. 20.

9. Transferability of job skills was not material to the determination of disability. Tr. 20.

10. Considering Bolton's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Woods could perform. Tr. 20.

Based on the foregoing, the ALJ determined that Bolton had not been under a disability from October 13, 2008, through April 14, 2011, the date of the decision. Tr. 21.

## V. Parties' Arguments

### A. Plaintiff's Arguments

    Bolton argues that the ALJ erred by failing to recognize the treating opinion of Dr. Bukuts and by improperly disregarding the opinion of consulting examiner Dr. Pickholtz. Doc. 14, pp. 11-16. Additionally, she argues that, had the ALJ given proper consideration and weight to the opinions of Drs. Bukuts and Pickholtz, substantial evidence would demonstrate that Bolton's impairments satisfy the disability criteria in both A and B of Listings 12.03[9] and 12.04.[10] Doc. 14, pp. 16-18.

---

[9] Listing 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders.

[10] 12.04 Affective Disorders.

14

### B. Defendant's Arguments

In response, the Commissioner argues that the opinion referred to by Bolton as the opinion of Dr. Bukuts is actually the opinion of a psychiatric nurse practitioner, not a physician. Doc. 15, pp. 7-12. Further, Defendant argues that the ALJ properly considered and discounted that opinion. Doc. 15, pp. 7-12. Regarding Dr. Pickholtz, Defendant argues that the ALJ properly did not give Dr. Pickholtz's GAF assessment of 45 significant weight because the ALJ determined that a GAF of 45 was not consistent with how Bolton presented to Dr. Pickholtz. Doc. 15, pp. 10-12. Defendant further argues that the ALJ properly determined that Bolton did not meet or equal a Listing. Doc. 15, pp. 12-16.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ properly considered the August 24, 2009, opinion of Bolton's nurse practitioner or specialist that was signed by the nurse and Dr. Bukuts.

Bolton first argues that the ALJ improperly identified the August 24, 2009, Mental Status Questionnaire as the opinion of a psychiatric nurse rather than that of a treating physician and, further, the ALJ's reasons for discounting the opinion are not supported by substantial evidence. Doc. 14, pp. 11-14.

15

Although Plaintiff argues that the August 24, 2009, Questionnaire is her treating physician's opinion, she points to no evidence in the record that Dr. Bukuts did in fact actually treat her.  Furthermore, the pages of the August 24, 2009, Questionnaire which contain opinions concerning Bolton's mental status are individually signed by someone other than Dr. Bukuts.  Tr. 458-459.  Since the August 24, 2009, Questionnaire response was not an opinion of a treating physician, the ALJ is not bound by the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. Appx. 496, 507 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.*, 152 F. Appx. 485, 490 (6th Cir. 2005).  The ALJ did not err in considering the opinion to be that of Bolton's treating psychiatric nurse or in not providing controlling weight to the opinion.  Tr. 18.

Additionally, the ALJ did properly consider and weigh the opinion.  Tr. 18.  Although a nurse, even a treating nurse, is not an "acceptable medical source," an ALJ should consider opinions from such "other sources" and an ALJ generally should explain the weight provided to such "other sources."  20 C.F.R. § 1513; SSR 06-03P, 2006 WL 2329939, * 6.  It is clear from the ALJ's decision that the ALJ did consider the nurse's opinions and also provided an explanation for the limited weight assigned to her opinion.  Tr. 18-19.  The ALJ found that the nurse's opinion was not wholly supported by the treatment notes.  Tr. 18-19.  A review of the record demonstrates that the ALJ"s reasoning is supported by substantial evidence.  Tr. 391, 394-396, 547, 549, 552, 556.  Thus, the ALJ did not err in her consideration of the August 24, 2009, opinions from Bolton's treating nurse.

**B.    The ALJ properly considered the March 3, 2009, opinion of consultative examining psychologist Dr. Herschel Pickholtz.**

Plaintiff argues that the ALJ, when assessing Dr. Pickholtz's opinion, overstepped her role as a judge by acting as a medical expert and also misconstrued the GAF scale.  Doc. 14, pp. 14-16.  The Regulations provide that, when an ALJ evaluates a medical opinion such as that of

16

consultative examining physician Dr. Pickholtz, he/she is to consider relevant factors such as the examining relationship, treatment relationship, length of relationship and frequency of the examination, nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, specialization and other factors. 20 C.F.R. § 404.1527(c).  "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we [the Commissioner] will give that opinion. The better an explanation a source provides for an opinion, the more weight we [the Commissioner] will give that opinion. 20 C.F.R. § 404.1527(c)(3).  "An ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. Appx. 149, 157 (6th Cir. 2009).  Here, the ALJ did not act as a medical expert; she assessed Dr. Pickholtz's opinion in accordance with the Regulations in order to establish Bolton's RFC.

As a one-time examining physician, Dr. Pickholtz did not have an ongoing treatment relationship with Bolton and therefore his opinion is not entitled to controlling weight as the opinion of a treating physician would be.  *See Kornecky*, 167 F. Appx. at 507*; Daniels,* 152 F. Appx. at 490.  Notwithstanding the fact that Dr. Pickholtz was not a treating physician, the ALJ did consider and evaluate his opinion in accordance with the Regulations.  The ALJ considered the supportability of Dr. Pickholtz's opinion and the consistency of his opinion with the record as a whole and, after doing so, the ALJ gave only limited weight to Dr. Pickholtz's opinion.  Tr. 18.

The ALJ found that Dr. Pickholtz's findings of marked restrictions and a GAF of 45 were not fully supported by Dr. Pickholtz's narrative of Bolton's mental status describing moderate, not marked, impairments and activities of daily living not suggestive of marked impairments.

Tr. 18.  Further, in giving limited weight to Dr. Pickholtz's opinion, the ALJ reflected on the fact that Dr. Pickholtz considered Bolton's physical impairments when assessing her GAF.  Tr. 18.  The ALJ's reasoning is supported by the record.  For example, in his description of Bolton's "mental content," Dr. Pickholtz describes Bolton as experiencing periodic, rather than continual hallucinations and states that, with psychiatric medication, the degree of psychotic processing would decrease greatly.  Tr. 315.  Dr. Pickholtz indicated that "the impact of the psychotic process upon daily routine was described as being *moderately* disruptive."  Tr. 315 (emphasis added).  Further, in his description of her "affect and mood," he indicates that, "[w]ith psychiatric medication, the patient experiences *moderate* affective complaints."  Tr. 314 (emphasis added).

     An ALJ's failure to properly weigh or reference a GAF score is not a basis for reversal of a disability determination.  *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 415 (6th Cir. 2006) (stating that a GAF score does not have a direct correlation to the severity requirements of the mental disorder listings and recognizing that denials of social security benefits have been affirmed where an applicant had a GAF score of 50 or lower).  Here, the ALJ's reasons for giving limited weight to Dr. Pickholtz's opinion of marked limitations, which relate to Dr. Pickholtz's GAF score, are supported by the record.  In explaining her assessment of Dr. Pickholtz's opinion, and specifically his GAF score of 45, the ALJ indicates that Dr. Pickholtz "clearly considered the claimant's physical impairments when determining a Global Assessment Functioning score of 45 . . ."  Tr. 18.  The fact that Dr. Pickholtz did in fact consider Bolton's physical impairments is reflected in the record.  Tr. 318.  Specifically, when assessing Bolton's GAF, Dr. Pickholtz states "[t]he impact of her *physical* complaints relative to socialization and work functioning fall within the serious range of impairment between 41 and 50, probably 45."

Tr. 318 (emphasis added).  Moreover, the *Diagnostic and Statistical Manual of Mental Disorders* provides that that impairment of functioning due to physical limitations is not to be considered when assessing GAF.  DSM-IV-TR at 34.   Thus, Dr. Pickholtz's reliance on Bolton's physical impairments when assessing her GAF was contrary to the *Diagnostic and Statistical Manual of Mental Disorders.*   In light of the fact that the ALJ properly supported and explained her basis for assigning limited weight to Dr. Pickholtz, Plaintiff's argument that the ALJ misconstrued Dr. Pickholtz's GAF score when she indicated that a GAF score of 45 would indicate a need for hospitalization is not a sufficient basis for reversal.  *See DeBoard*, 211 Fed. Appx. at 415.

C. **The ALJ properly determined that Bolton's impairments did not meet or equal a Listing.**

Plaintiff argues that the opinions of Dr. Bukuts and Dr. Pickholtz establish that Bolton's impairments meet or equal Listing 12.03 for schizophrenia, paranoid and other psychotic disorders and Listing 12.04 for affective disorders and, therefore, had the ALJ given appropriate weight to those opinions the ALJ would have found that Bolton's impairments met or equaled either or both of the Listings.  Doc. 14, pp. 16-18.  Having determined that the ALJ did properly consider and assess the medical opinions, Plaintiff's argument is without merit.  Further, the responsibility for deciding medical equivalence rests with the administrative law judge, 20 C.F.C. § 404.1526(e), and a review of the ALJ decision demonstrates that the ALJ fully considered Bolton's impairments and evaluated her impairments under Step Three to determine whether Bolton's impairments met or equaled a Listing.  Tr. 12-13.  The ALJ determined that Bolton had mild restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence or pace for simple routine tasks, and marked difficulties with regard to concentration, persistence or pace for detailed and complex tasks; and no episodes of decompensation of extended duration.  Tr. 12.

Thus, since the ALJ determined that Bolton's mental impairments did not cause at least two "marked limitations" or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied and therefore no mental impairment Listing was met.  Tr. 12.   The ALJ's findings are supported by substantial evidence and Plaintiff's argument that the ALJ erred at Step Three is without merit.

## V.  Conclusion and Recommendation

For the foregoing reasons, it is recommended that the Commissioner's decision be **AFFIRMED**.

Dated:  November 19, 2012

Kathleen B. Burke
United States Magistrate Judge

### **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).